UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Duane Cameron,<br><br>         Plaintiff,<br><br>    v.<br><br>Sun Life Assurance Company of<br>Canada, et al.,<br><br>         Defendants. | Case No.  2:21-cv-02092 JLS (AFM)<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW RE:<br>CROSS MOTIONS FOR<br>JUDGMENT (Docs. 31-32)**<br><br>**ORDER DENYING AMENDED<br>REQUEST TO SUPPLEMENT<br>THE ADMINISTRATIVE<br>RECORD (Doc. 39)** |

      This action arises out of Plaintiff Duane Cameron's claim for benefits under a policy for long-term disability ("LTD") insurance issued by Sun Life Assurance Company of Canada ("Sun Life") under a Group Insurance Policy[1] issued by Plaintiff's former employer, USC Verdugo Hills Hospital.

      The parties have filed Opening and Responsive Trial Briefs.  (*See* Docs. 31-32, 44-45.)  The Court considered has considered the parties' arguments presented therein, their arguments made at the proceeding on April 27, 2022, the LTD

---

[1] The claim also sought a Life Waiver of Premium benefit under the Group Policy.  This provision waives the premium based on the insurer's disability.  The disability threshold for this provision is the "any occupation" standard, that is:  "Total Disability or Totally Disabled for purposes of determining eligibility for Waiver of Premium means an Employee, because of Injury or Sickness, is unable to perform the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training, or experience."  (AR 57.)

Administrative Record ("AR") filed by Sun Life, and a related short-term disability ("STD") claim file.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the findings of fact and conclusions of law set forth below.[2]  The Court reviews *de novo* Sun Life's decision to deny LTD benefits.[3]  As set forth more fully below, the Court concludes that Plaintiff is entitled to LTD benefits through and including January 29, 2020.

# I.  LEGAL STANDARDS

## A.  Federal Rule of Civil Procedure Rule 52

This matter is properly before the Court pursuant to Federal Rule of Civil Procedure 52.  Rule 52 motions for judgment are "bench trial[s] on the record," and the Court "make[s] findings of fact under Federal Rule of Civil Procedure 52(a)." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (*en banc*).  "In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true."  *Id.*

## B.  Standard of Review

The Court reviews this matter *de novo*.  Under a *de novo* standard of review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  That is, the Court "determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).

## C.  Burden of Proof

Plaintiff bears the burden of establishing by a preponderance of the evidence his entitlement to benefits (*i.e.*, that he was disabled under the terms of the policy during the relevant claim period).  *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163

---

[2] To the extent any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact. To the extent any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

[3] The parties agree the relevant standard of review is *de novo*.  (*See* Pltf. Opening Br. at 21; Def. Opening Br. at 21.)

(9th Cir. 2016); *Muniz*, 623 F.3d at 1294.  To do so, Plaintiff must establish that he was more likely than not "totally disabled" under the terms of the relevant policy at the time his benefits were denied or were terminated.  *See, e.g., Hart v. Unum Life Ins. Co. of Am.*, 253 F. Supp. 3d 1053, 1074 (N.D. Cal. 2017); *Porco v. Prudential Ins. Co. of Am.*, 682 F. Supp. 2d 1057, 1080 (C.D. Cal. 2010).

### D.    Evidence Considered by the Court

The Court generally limits its review to "the evidence that was before the plan administrator at the time [the] determination [was made]."  *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007).  Evidence before the Court need not be admissible under the Federal Rules of Evidence; instead, it "may be considered so long as it is relevant, probative, and bears a satisfactory indicia of reliability."  *See Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999).

Under "certain limited circumstances," evidence outside the administrative record may be considered, such as where that evidence is necessary to conduct an adequate *de novo* review of the benefit decision.  *Opeta*, 484 F.3d at 1217.  Plaintiff here has offered extrinsic evidence relating to time periods beginning in September 2020.  (Doc. 39.)  As explained below, the Court concludes there was no evidence of disability after Plaintiff's January 29, 2020 doctor visit and before the first week of March 2020 when he suffered another heart attack.  Thus, Plaintiff's entitlement to benefits ceased at the end of January 2020, and evidence regarding his disability in and after September 2020 are not relevant to the Court's analysis.  Therefore, the Court has not considered it.

### E.    Analyzing Medical Evidence

A mere diagnosis is not dispositive of the issue of disability.  *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability. . . . A claimant bears the burden of proving that an impairment is disabling.") (internal quotation marks and citation omitted).

In performing a *de novo* review, the Court is not required to accept the

conclusion of any particular treatment provider or medical file review.  For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Instead, medical opinions "must . . . be accorded whatever weight they merit."  *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing *Nord*).

The Court may give greater weight to a treating physician's opinion where it is evident a particular physician has had "a greater opportunity to know and observe the patient than a physician retained by the plan administrator" who conducts a file review.  *Id.* (internal quotation marks omitted).  However, where a treating physician lacks expertise in a particular area, and the plan's retained expert is a specialist in that area, it may be appropriate for a court to give greater weight to the specialist who merely conducts a file review.  *See Nord*, 538 U.S. at 832.

Moreover, in cases such as this one, courts have noted an apparent tension between treating physicians, who may tend to favor an opinion of "disabled" in a close case, and physicians who are routinely hired by plan administrators, who may favor a finding of "not disabled" in the same case.  *See id.*  It is therefore incumbent upon the Court to carefully assess and weigh all the evidence in light of the issues before the Court.  Here, the Court has done so.

## II.   FINDINGS OF FACT

In relevant part, the evidence before the Court may be summarized as follows.

### A.   STD and LTD Policies

Sun Life issued to policyholder USC Verdugo Hills Hospital ("USC Hospital") a Group Term Insurance Policy ("Group Policy") on February 27, 2013 that provides both STD and LTD benefits.  (AR 45.)  The STD policy provisions are relevant, but only the claim for LTD benefits is at issue here.

As to STD benefits, the Group Policy pays a Net Weekly Benefit (as defined) if an employee-claimant satisfies the Elimination Period, provides Proof of continued

Total or Partial Disability, and is under the Regular and Continuing Care by a Physician who provides appropriate treatment in accordance with the disabling condition.  (AR 81.)  As to LTD benefits, the Group Policy pays a Net Monthly Benefit (as defined) if an employee-claimant satisfies the Elimination Period, provides Proof of continued Total or Partial Disability, and is under the Regular and Continuing Care by a Physician who provides appropriate treatment in accordance with the disabling condition.  (AR 86.)

Relevant Policy Provisions state:

> Total Disability or Totally Disabled means the Employee, because of injury or sickness, is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Usual Occupation in the usual or customary way. . . . To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability, or a combination of days of Total and Partial Disability.
>
> Usual Occupation means any employment, business, trade or profession and the Substantial and Material Acts of the occupation the Employee was regularly performing when the Total or Partial Disability began.  Usual Occupation is not necessarily limited to the specific job the Employee performed for the Employer.

(AR 63-64 (paragraph structure altered).)

> Substantial and Material Acts means the important tasks, function and operations generally required by employers from those engaged in the Employee's Usual Occupation that cannot be reasonably omitted or modified.
>
> In determining what Substantial and Material Acts are necessary to pursue the Employee's Usual Occupation, Sun Life will first look to the specific duties required by the job.  If the Employee is unable to perform

one or more of these duties with reasonable continuity, Sun Life will then determine whether those duties are more customarily required of other individuals engaged in the Employee's Usual Occupation.  If any specific, material duties required of the Employee by his job differ from the material duties customarily required of other individuals engaged in the Employee's Usual Occupation, then Sun Life will not consider those duties in determining what Substantial and Material Acts are necessary to pursue the Employee's Usual Occupation.

(AR 63.)

Elimination Period means a period of days of Total or Partial Disability for which no LTD Benefit is payable [as shown in Section I, Schedule of Benefits] and begins on the first day of Total or Partial Disability.

(AR 62.)  For Plaintiff, the Elimination Period is defined as "90 days or the end of the Employee's Short Term Disability Maximum Benefit Period, whichever is later." (AR 53.)

A claim must provide proof of his disability, which may include:

4. [C]linical evidence substantiating the Employee's sickness or injury including but not limited to Hospital records; Physician records; Psychiatric records, vocational testing records; X-rays, laboratory results, toxicology results, narrative reports or other diagnostic testing materials, as appropriate for the disabling conditions.

(AR 63.)

Regular and Continuing Care means the Employee visits a Physician whose medical specialty is appropriate to evaluate, manage, or treat the Employee's sickness or injury and the Employee receives care and treatment as frequently as is necessary to improve the condition, keep it from worsening, or until maximum recovery is reached.

1  (AR 63.)

2        The terms of the Group Policy provide that an employee's insurance expires the

3  date the Group Policy is terminated.  (AR 93.)  The Group Policy was terminated by

4  USC Hospital on December 31, 2019.  (AR 290, 1200-1201.)

5        Disability benefits continue through the earliest of the following events:

6  (1) once the employee is no longer totally or partially disabled, (2) once the employee

7  is no longer under a physician's care and receiving treatment for the disabling

8  condition, (3) the employee dies, (4) the end of the maximum benefits period as

9  defined under the Group Policy; (5) the date the Employee unreasonably fails to

10  provide necessary documentation regarding other earnings and information regarding

11  total or partial disability, or (6) the date the employee's income exceeds a threshold

12  amount.  (AR 89.)

13        **B.    Claim History and Procedural History**

14        Plaintiff applied for disability benefits under the Group Policy on November 22,

15  2019.  (STD AR 6; AR at 191.)[4]  He claimed chest pain and high blood pressure

16  dating back to August 22, 2019.  (STD AR 7.)  At the time of his claim, he had seen

17  his internist and a cardiologist and had future scheduled appointments with both.

18  (STD AR 7.)  His primary care physician identified a return-to-work date of January

19  31, 2020.  (STD AR 35.)  Sun Life granted his claim for STD benefits.  (STD AR 1.)

20  Because Plaintiff had sick leave benefits from his employer, the benefits paid were the

21  minimum payments of $25 per week, from August 22, 2019, to November 27, 2019,

22  approximately 13 weeks,[5] which is the maximum benefit period.  (*See* STD AR 1.)

23        Plaintiff's short-term disability claim form also served as the basis for his claim

24  for LTD benefits.  The claim form states the basis for his claim (chest pain and

25  hypertension); specifically, it states that on the last date he worked, August 22, 2019,

26

27  ───────────────
   [4] The STD administrative record is separately paginated.  "STD AR" designates the STD
   administrative record.  "AR" designates the LTD administrative record.

28  [5] This is a few days more than 13 weeks, and a few days more than the 90-day LTD benefits
   elimination period, but this discrepancy does not alter the Court's analysis.

he first experienced symptoms and was admitted to USC Hospital for "Chest Pain/High Blood Pressure." (AR 191-92.)  He was discharged from the hospital on August 24, and he expected to return to work on January 29, 2020.  (AR 192-93.)

Sun Life denied Plaintiff's claim for LTD benefits on March 4, 2020, stating that the information received was insufficient to establish his total disability under the Group Policy.  (AR 283-85.)  Plaintiff's Life Waiver of Premium claim was denied on a similar basis, that the medical records did not support his claim that he was unable to perform the Material and Substantial duties of Any Occupation as required by the Group Policy on March 10, 2020.  (AR 311-15.)

Plaintiff appealed, and Sun Life affirmed its denial in a letter to Plaintiff's counsel on February 22, 2021.  (AR 1164-81.)

### C.   Medical Evidence

| 09/01/13 | Plaintiff had a percutaneous coronary intervention ("PCI") with two stents placed.  (AR 440.) |
|---|---|
| 08/22/19 | Plaintiff was hospitalized through August 24, 2019.  (*See* AR 265-66 (discharge summary).)  Plaintiff was diagnosed with coronary artery disease ("CAD"), hypertension, and degenerative arthritis of the spine. He was noted to being continued on basically the same medications as he had been on, with only slight changes by his primary care physician, Michael E. Klein, M.D.  Although he was admitted with chest pain, he had none while hospitalized, he was ambulating, and free of pain. Plaintiff's physical exam was noted to be "unremarkable" and his blood pressure was well controlled.  Dr. Klein identified occupational stress as a reason why Plaintiff should not work:  "I think we are going to put him off work for a period of time as some of his stress and difficulties through work are beginning to . . . negatively affect his health and I think will result in further hospitalizations or problems." |
| 08/27/19 | A chart note from the USC Pain Center indicates that, at least from a pain |

perspective,[6] Plaintiff "endorses good functionality and is able to work full-time under his current regimen." (AR 531.)

08/30/19    Plaintiff followed up with Dr. Klein, who noted in his chart that Plaintiff "was in the hospital last week with chest pain but his workup didn't show any specific changes [as] far as ischemia . . ." (AR 267.) The note discussed "some chronic back issues and in recent years [and] problems related to his coronary disease." Plaintiff was noted as experiencing "exertional chest tightness." Plaintiff discussed work stress with Dr. Klein who determined he should be off work for sixty days to avoid work "affecting him negatively from the medical standpoint."

10/30/19    Plaintiff again saw Dr. Klein, who noted normal pulse, blood pressure, carotid arteries, and heart rhythm. (AR 268.) Dr. Klein also noted the absence of chest pain and palpitations and increase in walking for exercise. But Dr. Klein also noted that Plaintiff "has coronary artery disease[,] . . . was hospitalized recently with more chest pain aggravated by stress[,] . . . has a long history of lumbar disc problems[, and] we all agree that it is more risk than benefit for him to return to work but he wants to give it another 90 days until January before he decides to stop working completely and I think that's a reasonable and safe decision." (*Id.*) Dr. Klein noted: "While he has improved since I last saw him I think another 90 days off work so that Dr. Lee and myself reevaluate the long-term plan and the potential risk and benefits of further stress for this gentleman with known coronary disease [who] was just recently hospitalized [for] chest pain."

11/20/19    Plaintiff saw his cardiologist. (AR 245-46.) Dr. Lee noted a diagnosis of chest pain, but also included it in a list of "[i]nactive [p]roblems." Dr. Lee notes that Plaintiff's "work related stress issues [were]

---

[6] Despite Plaintiff's hospitalization being just a few days earlier, this note makes no mention of it.

|   |   |   |
|---|---|---|
| 1 |  | predominately [*sic*] managed by Dr. Klein." |
| 2 | 11/21/19 | Plaintiff was seen at USC Pain Management Clinic.  (AR 531.)  The |
| 3 |  | treatment notes state:  Patient is here for follow up.  He has been on |
| 4 |  | medical leave since hypertensive crisis in August. . . . Stress related pain |
| 5 |  | has improved since on leave as well."  Plaintiff reported some spinal pain |
| 6 |  | radiating into his right leg and foot, but that he had been active and |
| 7 |  | walking 10,000 steps per day. |
| 8 | 11/26/19 | Dr. Klein filled out an Attending Physician's Statement ("APS").  (AR |
| 9 |  | 203-08.)  Dr. Klein indicated diagnoses of "CAD - chest pain" and |
| 10 |  | "HTN" (hypertension), that emergency room ("ER") care was required |
| 11 |  | for the condition, and that Plaintiff should be off work until January 31, |
| 12 |  | 2020. |
| 13 | 01/09/20 | Plaintiff was seen at USC Pain Management Clinic.  (AR 531.)  He |
| 14 |  | reported intermittent numbness and tingling in his fingers and right hand |
| 15 |  | weakness.  He also reported a lower cervical radiating pain.  He reported |
| 16 |  | he walks his dogs regularly. |
| 17 | 01/29/20 | A note from Dr. Klein indicates normal blood pressure with a normal |
| 18 |  | heart rate and rhythm, no recent chest pains or palpitations, carotid |
| 19 |  | arteries are normal, and the heart rate and rhythm are clear.  (AR 262.) |
| 20 |  | There is no indication that Plaintiff was seeking additional disability |
| 21 |  | verification, and Dr. Klein's notes do not reflect that he provided any. |
| 22 |  | Dr. Klein notes that Plaintiff is "retiring because of his cardiac issues and |
| 23 |  | earlier than planned because of a great deal of stress at work."  Dr. Klein |
| 24 |  | further notes that Plaintiff had "sold his house," was "leaving the hospital |
| 25 |  | permanently," and was moving with his wife to Idaho.  Because Plaintiff |
| 26 |  | was moving, Dr. Klein recommended a "complete follow-up physical |
| 27 |  | examination at the end of the summer or early fall." |
| 28 | 03/02/20 | Sun Life's Nurse Brenda Gross was asked to determine if the available |

medical data supported the restrictions and limitations stated by Dr. Klein in the initial APS that Plaintiff could not return to work until January 31, 2020. (AR 274-278.)  She noted Plaintiff was clinically stable when he was discharged from the hospital and was essentially asymptomatic after that time with continued medical treatment.  Based on this, Gross opined that Klein's "off work" limitations was overly restrictive.  Gross expressed doubt regarding the concern about Plaintiff's stress level, noting that she would expect to see behavioral health care such as counseling or stress management if that were a genuine concern.

03/10/20 | Plaintiff saw Dr. Klein.  (AR 557.)  Dr. Klein noted that Plaintiff had called him to report "new symptoms" the Friday before.  Plaintiff's wife reported that he had been having "mild dyspnea" (painful breathing or shortness of breath) and a "near syncopal episode" (nearly fainting) the prior Friday.  On the date of the visit, Plaintiff was reporting "some mild chest pressure which [had] been going on and off for at least a week maybe more."  These symptoms caused Dr. Klein to send Plaintiff to the emergency room at Adventist Hospital in Glendale.

03/11/20 | The next day, Plaintiff had a coronary angioplasty with one stent placed. (AR 438-443.)  Surgeons noted an "85-90% stenosis in the PLM branch of the dominant RCA supplying the lateral LV left circumflex only of moderate caliber."  The surgery was successful:  "Vessel successfully angioplasted and stented.  LV function and wall motion normal."  Plaintiff was discharged the following day.

04/22/20 | Dr. Grimes, an internist, reviewed Plaintiff's file for Sun Life.  (AR 502-506.)  Based on the review of Plaintiff's records, Dr. Grimes concluded that Plaintiff would have been precluded from working from August 22, 2019 to one week after his discharge from the hospital, or August 31, 2019.  Thereafter, according to Dr. Grimes, Plaintiff would have been

again precluded from working in the four to six weeks following his March 12, 2020 angioplasty. Despite acknowledging that Plaintiff "states he has a very stressful job as a radiology administrator," and Plaintiff's reports of "chest pain with a stress reaction," Dr. Grimes does not discuss whether Plaintiff's cardiac condition would be exacerbated by the stress he was likely to encounter on his job. Specifically, in the original report, Dr. Grimes acknowledges the "stress reaction" that contributed to Plaintiff's hospitalization in August 2019, but nevertheless, in setting forth that diagnosis, he opined without further comment that it imposed "[n]o restrictions [or] limitations." (AR 504.)

04/29/20   Plaintiff's cardiologist, Dr. Lee, made comments in a letter that is undated on its face, but which was apparently written on or about April 29, 2020. Therein, Dr. Lee apparently makes a mistake by referring to Plaintiff's "most recent [cardiac] intervention" as having occurred on August 22, 2019, but he likely has in mind Plaintiff's March 11, 2020 cardiac surgery.[7] (*See* AR 587.) Dr. Lee expressly noted he joined with Dr. Klein's opinion that Plaintiff should not work. Dr. Lee twice noted how the stress level of Plaintiff's position contributed to his inability to work. (*See id.* ("Because of his duties as an administrative director of diagnostic services at USC Medical Center he had been under a great deal of stress as he was working on plans to provide new services at the hospital. . . . It is very likely that stress was contributory to his progression of disease in his coronaries [*sic*].").)

05/04/20   In a letter to Sun Life, Dr. Klein explained his reasoning for concluding Plaintiff should not continue to work:

> It is my medical opinion that [Plaintiff's] ongoing cardiac issues
> and the significant symptoms related to those cardiac issues and

---

[7] Because of this mistake, Dr. Lee's letter is ambiguous as to timing.

the medications required to treat those issues, put him at significant risk if he were to continue working.  His ongoing symptoms of angina, near syncope and dyspnea all in the face of known coronary artery disease, place him at extreme risk for increasing morbidity and mortality issues, if the symptoms continue[,] particularly given the stress level and the work environment that he has been subjected to here at the hospital in recent years.

(AR 575).  Dr. Klein also suggested that Sun Life engage a cardiologist to review Plaintiff's claim.[8]

05/22/20   In a supplemental report dated May 22, 2020, Dr. Grimes stated that his April 22, 2020 opinion was unchanged by review of additional medical records.  (*See* AR 589-594.)

11/30/20   Dr. Gerstenblitt examined Plaintiff on behalf of Sun Life.  (AR 828-843 (original report); AR 1147-1152 (supplemental report, based on same examination).)  He also reviewed Plaintiff's medical records.  Like Dr. Grimes, Dr. Gerstenblitt would limit when Plaintiff could not work to while he was hospitalized August 22 through August 24, 2019, and two weeks after his heart surgery on March 11, 2020.  As for the effect of occupational stress on Plaintiff's health, Dr. Gerstenblitt's original report echoed Nurse Gross's opinion about the lack of stress management treatment:  "[H]e is not getting any treating [*sic*] for the stress or any underlying possible mental health issues, which led to him going out of work in the first place."  (AR 842.)  In his supplemental report, Dr. Gerstenblitt hedges further, acknowledging that "[t]here is some mention of stress being a concern," but nevertheless states that "whether [Plaintiff could] work from a mental health perspective is beyond the scope of [his] examination [of Plaintiff]."  (AR 1151.)

---

[8] It does not appear that Sun Life took this suggestion.

01/21/21   After a comprehensive file review as requested by Plaintiff's counsel, Mechel Henry, M.D., whose letterhead indicates he is board certified in physical medicine and rehabilitation and pain management, opined that Plaintiff had been disabled and unable to work since August 21, 2019. (AR 961-982.)  Dr. Henry does not break down the timeline in detail; instead, seventeen months after Plaintiff stopped working, he opines that due to all of Plaintiff's difficulties—cardiac, neurologic, visual injuries, orthopedic injuries, and side effects of medication—Plaintiff had been unable to work since August 21, 2019.

## IV.    CONCLUSIONS OF LAW AND ENTITLEMENT TO BENEFITS

The Group Policy is an "employee welfare benefit plan" governed by ERISA. *See* 29 U.S.C. § 1002(1).

As discussed below, the Court concludes that Plaintiff was "totally disabled" under the terms of the Group Policy from the date of the expiration of his short-term disability benefits period until January 29, 2020, which entitles him to LTD benefits for that time period.  Because the administrator "applied the right standard, but came to the wrong conclusion" regarding whether Plaintiff was totally disabled under the terms of the Group Policy, the appropriate remedy is "[r]etroactive reinstatement of benefits." *Grosz-Salomon*, 237 F.3d at 1163.

Plaintiff's long-term primary care physician repeatedly and consistently assessed him as disabled during this time period, based on a combination of his cardiac condition and occupational stress.  Specifically, Dr. Klein stated this in Plaintiff's August 22, 2019 hospital discharge notes, and he stated it again a week later in an office note that advised an additional 60 days off work.  He reiterated it in an office note the end of October 2019, this time advising another 90 days off work.  Significantly, it is clear from the record that Dr. Klein had a long-term physician-patient relationship with Plaintiff, having been his doctor for 17 years.  (AR 267).  Moreover, Dr. Klein's office notes are not mere check-the-box assessments of his

patient; to the contrary, Dr. Klein's discharge comments and contemporaneous office notes are narrative in form and, in the case of his office notes, are several paragraphs long.  (AR 262, 265-268.)  Because of the length of Dr. Klein's relationship with Plaintiff, and based on these narratives, the Court finds Dr. Klein's opinion regarding Plaintiff's inability to work especially persuasive and therefore gives it great weight.

To the extent that Sun Life relies on the office note of Plaintiff's cardiologist, Dr. Lee, from November 20, 2019 (AR 284), it is clear that Dr. Lee, while classifying chest pain as an "[i]nactive [p]roblem[]," clearly deferred the work stress-related issues to Dr. Klein.  (AR 245-246.)  It is equally clear that Dr. Klein relied on not only Plaintiff's cardiac issues but also his work-related stress, that is, the combination of the two, to conclude Plaintiff was unable to work.

While no substitute for evidence, case law on this issue provides support for the proposition that cardiac issues can combine with work-related stress to produce a disabling condition.  When viewed with the evidence of record here, that case law strongly supports a finding of total disability under the terms of the Group Policy.  For instance, in *Glenn v. MetLife*, the Sixth Circuit found arbitrary a plan administrator's decision to deny benefits where it failed to consider the "consistent and repeated references by [the plaintiff's doctor] to stress as a factor in [the plaintiff's cardiac] condition" in making its claims decision.  461 F.3d 660, 672-73 (6th Cir. 2006), *aff'd on other grounds, Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).  Moreover, in awarding benefits in *Lasser v. Reliance Standard Life Ins. Co.*, the court criticized one doctor's failure to account for occupational stress in combination with a cardiac condition:  "By ignoring the question of occupational stress in relation to [the doctor-plaintiff's] cardiac health and what professional duties it is medically reasonable for him to perform, Dr. Burke is at odds with the formidable weight and, indeed, unanimity of the other cardiologists opining on this case."  146 F. Supp. 2d 619, 625 (D.N.J. 2001), *aff'd*, 344 F.3d 381 (3d Cir. 2003).

Similarly, in *Popovich v. Metro. Life Ins. Co.*, 281 F. Supp. 3d 993, 1006 (C.D.

Cal. 2017), the court found that the plan administrator incorrectly denied LTD benefits where the combination of plaintiff's cardiac condition and occupational stress rendered her unable to perform his usual occupation. *Id.* ("[T]he Court finds that Plaintiff submitted reliable evidence that he suffers from a significant heart condition. Plaintiff is unable to work at a physically and mentally stressful occupation."). Thus, case law further supports the Court's conclusion regarding Plaintiff's entitlement to benefits under the Group Policy.

The opinion of Sun Life' reviewing medical consultant, Registered Nurse Brenda Gross, and those of its examining and reviewing physicians, Drs. Gerstenblitt and Grimes, do not convince the Court otherwise.  Nurse Gross failed to take into account how the combination of cardiac issues and occupational stress may combine to create a disabling condition.  Indeed, her report dismissed the concerns regarding Plaintiff's occupational stress out of hand, noting that, if stress were a real concern, she would expect some behavioral health treatment or stress management interventions.  (AR 278.)  This reflects the assumption that a behavioral health component should be part of a treatment plan for any person who claims an inability to work due to a combination of cardiac issues and work-related stress.  Medically and/or psychologically, this assumption may be sound, but there is no support in the record for this assumption.  The Court declines to find, without evidence, that behavioral health treatment would be expected to be a part of the treatment for such a patient.  Thus, Nurse Gross's report does not account for the combination of cardiac issues and occupational stress that Dr. Klein identified as the basis for Plaintiff's inability to work.  The Court therefore gives it little weight.

The same is true of the report of Sun Life's examining physician, Dr. Gerstenblitt, who echoed Nurse Gross's observation about the lack of behavioral health treatment.  (AR 842.)  When pressed further, in a supplemental report, Dr. Gerstenblitt declined to give an opinion on whether the combination of cardiac issues and occupational stress were disabling, noting that question was beyond the scope of

his exam.  (AR 1151.)  Instead, Dr. Gerstenblitt noted that he "focused on the cardiac and musculoskeletal and/or physical issues of the case not on his mental abilities to work." (*Id.*)  Thus, The Court likewise gives the examining doctor's opinion little weight.

The Court also gives little weight to the opinion of Dr. Grimes, who performed a file review for Sun Life.  Dr. Grimes' analysis does not discuss the combination of factors identified by Dr. Klein as disabling and instead focused solely on Plaintiff's physical condition.  (AR 503-505.)

Thus, Dr. Klein's opinion that Plaintiff was disabled through January 29, 2020 is the most persuasive evidence as to Plaintiff's ability to work during this period.  But just as the Court gives great weight to Dr. Klein's opinion of Plaintiff's inability to work, the Court gives the same weight to Dr. Klein's office note of January 29, 2020, in which he focuses on *Plaintiff's decision* to retire earlier than planned due to cardiac issues and work-related stress.  (AR 262.)  This establishes the end date of Plaintiff's entitlement to benefits.

Overall, Dr. Klein's notes regarding his long-term patient with heart trouble read as discussions of test results, symptomology, and occupational requirements (in the form of Plaintiff's ability to withstand work-related stress and still remain healthy).  That his notes reflect an assessment of risk to Plaintiff's health rather than merely Plaintiff's then-current symptomology is understandable.

In much the same way that returning to a job requiring heavy lifting may cause unacceptable strain on a patient with a recent back or leg injury, returning to a high-stress job may cause unacceptable strain on a cardiac patient.  Such risk assessments by physicians will necessarily be shaped by the particular condition of the patient, the patient's overall health, and the particular demands of his occupation.  Physician decisions regarding their patients' return-to-work dates and restrictions necessarily factor in such considerations, whether or not they are expressly stated.  Notably, however, at no time did Dr. Klein opine that Plaintiff should be considered

permanently disabled; rather, Dr. Klein's notes reflect a continuing period of risk assessment.

Specifically, at the time Plaintiff was discharged from the hospital in August, 2019, Dr. Klein remarked in the discharge summary: "I think we are going to put him off work for a period of time as some of his stress and difficulties through work are beginning to negatively affect his health and I think will result in further hospitalizations or problems." (AR 265-66.) At Plaintiff's follow-up appointment a few days later, Dr. Klein noted that occupational stress was adversely affecting Plaintiff, that it might continue to affect him such that he might consider retiring, and that he would therefore set a return-to-work date sixty days from the appointment. (AR 267.) Instead of returning to work, however, when Plaintiff saw Dr. Klein sixty days later, Dr. Klein authorized an additional ninety days off work, noting that "another 90 days" would allow Dr. Klein to work with Plaintiff's cardiologist to "reevaluate the long-term plan and potential risk and benefits of further stress for [Plaintiff]." (AR 268.) Ninety days later, on January 29, 2020, Dr. Klein's note reflects Plaintiff's decision to retire. (AR 262.) During these five months, there is no discussion of cardiac symptoms requiring intervention. And although certainly Plaintiff's decision to retire likely factored in the cardiac risk caused by working in a stressful job, there is no discussion of a then-current disabling condition that might have justified continued receipt of disability insurance benefits.

There is no evidence that any attempt was made during the January 29, 2020 visit to assess whether Plaintiff continued to be unable to work to the point of being "totally disabled" within the definition of the Group Policy. If Dr. Klein believed this to be the case at the time, one would expect mention of it in the office note rather than the discussion regarding Plaintiff's retirement. Therefore, as of the date of this office visit, the Court finds that Plaintiff was no longer totally disabled within the meaning of the Group Policy.

To be sure, approximately five weeks later, Plaintiff experienced another health

crisis involving chest pain and shortness of breath, resulting in coronary angioplasty. At that time, Plaintiff was no doubt again rendered unable to perform his previous job duties. Indeed, Defendant's own reviewing doctor acknowledged that this event would have been disabling for four to six weeks following surgery. (AR 504 (opinion of Dr. Grimes).)

But by then, Plaintiff had retired and, just as importantly, the Group Policy was no longer in force. Plaintiff attempts to have the time period from November 27, 2019 through March 2020 (and beyond) treated as a single period of disability. There is no persuasive evidence that Plaintiff was unable to perform the duties of his position during the month of February 2020 and during the first few days of March 2020. During this time period, his entitlement to benefits ended. (*See* AR 89 (noting that benefits terminate once the employee is no longer totally or partially disabled).) Because the Group Policy was no longer in force after December 31, 2019, an entitlement to benefits could not, and did not, begin anew.

Plaintiff relies on *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727 (9th Cir. 2006), which is distinguishable despite some similar facts. (*See* Pltf. Resp. Br. at 12-13.) In *Silver*, the plaintiff had a cardiac condition that manifested itself, as cardiac conditions tend to, in a series of emergencies requiring medical intervention. *Id.* at 729-732 (detailing two coronary bypass surgeries and three angioplasties). The court pointed to how the plaintiff experienced another emergency shortly after the insurer deemed him able to work under the terms of the policy. *Id.* at 735-36. However, what distinguishes the two cases is that, in *Silver*, the period before the later cardiac emergency was marked with symptoms that clearly precluded Silver from working, as assessed by physicians overseeing his case. *Id.* at 730, 734-35.

Here, when Dr. Klein saw Plaintiff on January 29, 2020, Dr. Klein noted that Plaintiff had chosen to retire, and he gave no indication he believed Plaintiff continued to be disabled. His later statement (AR 575), and the later statement of Plaintiff's file

reviewer Dr. Henry (AR 961-982), give opinions that do not distinguish between time periods and thereby gloss over this critical period between January 30, 2020 and March 6, 2020. This gloss does not substitute for evidence. Dr. Klein's contemporaneous assessment gave no indication of continuing disability during this time period. In February 2020, there is no evidence that Plaintiff, like Silver, continued to suffer cardiac-related issues. *Cf. Silver*, 466 F.3d at 734 ("Test results from these medical consultations produced myriad indications that his heart was still seriously diseased, ranging from a diagnosis of sleep apnea to high blood pressure . . . to an abnormal electrocardiogram to symptoms of bronchitis and emphysema.").

In the absence of a disability, the benefits under the Group Policy ceased. The later assessments, made with the benefit of hindsight, do not provide a basis for granting benefits to Plaintiff under a Group Policy that was no longer in force. Rather, for the Court to find that the prior Group Policy continued to apply, it would have to conclude that Plaintiff was continuously disabled through February 2020 and the first few days of March. The record does not support this conclusion.

As set forth herein, therefore, the Court concludes that the end date of Plaintiff's "total disability" as defined under the Group Policy is January 29, 2020.

## V.    CONCLUSION

Because the extrinsic evidence offered by Plaintiff is irrelevant, the Court denies Plaintiff's Amended Request To Supplement The Administrative Record. (Doc. 39.)

As set forth herein, the Court awards benefits to Plaintiff through January 29, 2020. The Court awards Plaintiff prejudgment interest at the rate fixed by 28 U.S.C. § 1691. *See Blankenship v. Liberty Life Assur. Co. of Bos.*, 486 F.3d 620, 627-28 (9th Cir. 2007).

Plaintiff shall prepare and lodge a proposed judgment within seven days of the entry of this Order. Any objections to the form of the judgment must be filed within seven days thereafter.

As a prevailing party, Plaintiff may seek costs in accordance with Cent. Dist. L.R. 54.

In accordance with the Court's Local Rule 54-7, any motion for attorney fees shall be filed no later than fourteen days after the Court's entry of judgment and shall be noticed for the Court's first available motions hearing date. This deadline may be extended by stipulation of the parties.

**IT IS SO ORDERED.**

**DATED:** November 2, 2022

The Hon. Josephine L. Staton
United States District Judge